**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 07-14084-CIV-MOORE

ASSURANCE COMPANY OF AMERICA,

     Plaintiff,

vs.

LUCAS WATERPROOFING COMPANY, INC.,
ROBERT K. LUCAS, individually, and
TRANSCONTINENTAL INSURANCE
COMPANY,

     Defendants.

_____/

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT BY ASSURANCE
CORPORATION OF AMERICA; GRANTING IN PART AND DENYING IN PART
TRANSCONTINENTAL INSURANCE COMPANY'S MOTION FOR SUMMARY
JUDGMENT; AND DENYING LUCAS WATERPROOFING COMPANY AND ROBERT
K. LUCAS' MOTION FOR SUMMARY JUDGMENT**

     THIS CAUSE came before the Court upon Plaintiff Assurance Company of America's

Motion for Partial Summary Judgment (dkt # 88); Defendants Lucas Waterproofing Company,

Inc. and Robert K. Lucas' Motion for Partial Summary Judgment as to Transcontinental

Insurance Company's Sixteenth Affirmative Defense to Count II of the Cross-Claim (dkt # 90);

and Defendant/Cross-Defendant Transcontinental Insurance Company's Motion for Summary

Judgment (dkt # 92).

     UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the

record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.    BACKGROUND**

     This case involves an insurance coverage dispute arising out of construction defects in

work performed at the Ocean Club at Orchid Island Condominium (the "Condominiums"), a five

building, 36-unit luxury condominium complex located in Vero Beach, Florida. Defendant

Orchid Island Properties, Inc. ("Orchid") was the developer, and W.G. Mills, Inc. ("Mills") was

the general contractor. Mills entered into two subcontracting agreements with Lucas

Waterproofing Company, LLC ("LWC"), wherein LWC agreed to install membrane

waterproofing under approximately 25,000 square feet of cast stone pavers on porches and to

waterproof certain walls under stone caps. LWC completed work on Buildings "A" and "B" and

applied for payment under the first subcontract on November 20, 1997. LWC completed work

on Buildings "C," "D" and "E" in March of 1999 and applied for payment under the second

subcontract on July 25, 1999. LWC was paid in full for both subcontracts. On or about

September 15, 1999, the Condominiums experienced wind and rain due to Hurricane Floyd. On

or about October 15, 1999, the Condominiums experienced wind and rain due to Hurricane Irene.

During and after the period of construction, LWC was covered by a series of Commercial

General Liability ("CGL") policies. From February 1, 1998, to February 1, 1999, LWC was

covered under a policy (the "Assurance Policy") issued by Assurance Company of America

("Assurance"). From February 1, 1999, to February 1, 2000, LWC was covered by a policy ("the

"Transcontinental Policy I") issued by Transcontinental Insurance Company

("Transcontinental"). From February 1, 2000, to February 1, 2001, LWC was covered under a

second Transcontinental policy (the "Transcontinental Policy II," together, the "Transcontinental

Policies," and collectively with the "Assurance Policy," the "Policies").

In 2001, the Ocean Club I and Ocean Club II Condominium Associations (collectively,

the "Association") brought suit against Orchid, Mills, and the architects. The suit alleged

construction and design defects in all five buildings, including property damage caused by water

2

inside the decorative soffit beams under the balconies, resulting in peeling and bubbling paint and mildew growth, as well as stucco discoloration or efflorescence. Mills, in turn, filed a third-party complaint against certain subcontractors, including LWC, for breach of contract and indemnification. Mills also brought suit against Robert Lucas ("Lucas") personally, pursuant to a Guaranty of Performance of Subcontract, wherein Lucas provided a personal guaranty for the work. The Association ultimately reached a settlement with Orchid wherein the Association assigned its claims against Mills and the architects to Orchid. On September 16, 2003, a global settlement was reached concerning all remaining claims, except for Mills' third-party claims against LWC, Lucas, and the stucco applier. The claims against the stucco applier eventually settled as well. In connection with the global settlement, Mills assigned its claims against LWC and Lucas to Orchid.

On December 12, 2005, Orchid filed a three-count complaint against LWC and Lucas in state court, alleging breach of the subcontract agreement by LWC, breach of the personal guaranty by Lucas, and seeking indemnification. Assurance defended LWC and Lucas under a reservation of rights. On June 9, 2006, a jury awarded Orchid $579,862 in damages against LWC. On November 2, 2006, the court entered final judgment against LWC in the amount of $1,105,852, consisting of $579,682 in compensatory damages, $448,793 in attorneys' fees, and $77,197 in costs. The jury also found that Lucas did not breach the personal guaranty agreement.

On March 15, 2007, the court entered an Order on Motion for Judgment in Accordance with Motion for Directed Verdict, holding that the jury's finding that Lucas did not breach the personal guaranty agreement was inconsistent with the evidence and the jury's other findings. The court entered judgment against LWC for $1,417,605.70, consisting of the $1,105,852 verdict against LWC, plus $312,023.74 in prejudgment interest. LWC and Lucas subsequently

demanded coverage under the Policies.

On March 22, 2007, Assurance filed a complaint in this action (dkt # 1) seeking a declaratory judgment that it has no duty to defend or indemnify LWC or Lucas, and if such duty exists, to determine the apportionment of such duty between itself and Transcontinental. A Second Amended Complaint (dkt # 6) was filed on April 12, 2007, and a Third Amended Complaint (dkt # 41) was filed on July 24, 2007. On August 3, 2007, LWC and Lucas filed an Answer and Counterclaim Against Assurance and Cross-claim Against Transcontinental (dkt # 50) seeking a declaratory judgment that Assurance and Transcontinental are liable to LWC and Lucas under the Policies.

## II.    STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual

4

inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.   ANALYSIS

### A.   Assurance's Motion for Summary Judgment

Assurance argues that it is entitled to summary judgment because any accident or injury triggering coverage occurred after the Assurance Policy expired. "It is well-established that in order to trigger coverage under an insurance policy, the accident or injury must occur during the time period of coverage." North River Ins. Co. v. Broward County Sheriff's Office, 428 F. Supp.2d 1284, 1289-90 (S.D.Fla. 2006) (quotation marks omitted). Florida courts follow the general rule that potential coverage under an insurance policy is triggered when property damage manifests itself, not when the negligent act or omission giving rise to the damage occurs. Id.; Essex Builders Group, Inc. v. Amerisure Ins. Co., 485 F. Supp.2d 1302, 1309 (M.D.Fla. 2006); *contra* Commercial Union Ins. v. R.H. Barto Co., 440 So.2d 383 (Fla. 4th DCA 1983) (finding that the date of the negligent act triggered coverage). There are, however, four generally accepted theories governing when coverage is triggered. Auto Owners Ins. Co. v. Travelers Cas. & Surety Co., 227 F. Supp.2d 1248, 1266 (M.D.Fla. 2002) (stating that the four generally accepted theories are "(1) exposure; (2) manifestation; (3) continuous trigger; and (4) injury-in-fact"). The application of these theories varies based on the occurrence for which coverage is

5

sought. Id.

> Under the exposure theory, property damage occurs upon installation of the
> defective product. Under the manifestation theory, property damage occurs
> at the time damage manifests itself or is discovered. The continuous trigger
> approach defines property damage as occurring continuously from the time
> of installation until the time of discovery. And injury-in-fact . . . coverage is
> triggered when the property damage underlying the claim actually occurs.

Id. (internal citations and emphasis omitted).

Assurance asserts that there is no question of material fact that the property damage

resulting in the judgment against LWC and Lucas transpired after the coverage provided by the

Assurance Policy terminated. In support of this assertion, Assurance provides a litany of

documents and testimonial statements from the underlying trial. See Pl.'s Statement of Material

Facts in Supp. of Mot. for Partial Summ. J. ¶¶ 32-52 (dkt # 89). The thrust of these documents

and testimonial statements is that no property damage caused by defective waterproofing

manifested itself until after the Assurance Policy expired, and that the damage was caused by the

1999 hurricanes. LWC and Lucas controvert these assertions, citing to other documents and

depositions. LWC asserts that these documents and statements indicate that property damage

caused by defective waterproofing occurred, and was discovered by Orchid, as early as August of

1998. See Def. LWC and Lucas' Statement of Material Facts in Opp. To Pl.'s Mot. for Partial

Summ. J. ¶¶ 1-10 (dkt # 97). Transcontinental also controverts Assurance's allegations that the

property damage occurred after the Assurance Policy expired, citing a number of documents

including field reports of architects and memoranda which indicate that the damage to the

Condominiums caused by the defective waterproofing began during the Assurance Policy period.

See Def. Transcontinental's Resp. In Opp. To Assurance's Mot. for Partial Summ. J., at 6-7 (dkt

# 107).

In its Reply, Assurance alleges that the documents cited by LWC and Transcontinental do not support their assertions that the property damage occurred during the policy period. Assurance asserts that all the documents cited by LWC attribute the peeling and bubbling paint to pressure washing and the mildew growth to airborne dirt and dust mixed with sea mist. *See* Pl.'s Reply Mem. In Supp. Of Mot. for Partial Summ. J., at 4-5. However, the fact that Orchid was under the belief at the time that the peeling and bubbling paint and mildew was attributable to other causes is not dispositive. While Orchid's subjective belief at the time is relevant, the fact that peeling and bubbling paint and mildew were among the same damages later found to have been caused by LWC's defective waterproofing leaves open the possibility that, unbeknownst to Orchid, the damage caused by LWC's defective work had already commenced while the Assurance Policy was still in effect.

This Court finds that there are issues of material fact concerning when and how the property damage caused by defective waterproofing occurred and when it manifested itself because the facts presented by each side would permit a reasonable jury to draw conclusions in favor of either party. The existence of material facts concerning the nature of the damage, i.e. whether it was continuously occurring from the time the defective work was performed or whether it began after the 1999 hurricanes, proscribes an analysis of which of the trigger of coverage theories to apply. Even assuming, without deciding, that Florida's general rule providing that coverage is triggered when property damage manifests itself is applicable here, there is nevertheless an issue of material fact as to when the property damage was discovered. The only issue briefed in Assurance's Motion for Summary Judgment (dkt # 88) was that the property damage at issue occurred after the policy period ended. Therefore, this Court will not attempt to determine if property damage arising from defective construction work is covered by

the Assurance Policy.

      B.      <u>Transcontinental's Motion for Summary Judgment</u>

           1.  Notice to Transcontinental by LWC

Transcontinental asserts that LWC is not entitled to coverage under the Transcontinental

Policies because LWC failed to provide notice of the defective waterproofing and the resulting

state court lawsuit. The insurance policies issued by Transcontinental to LWC provide, in

relevant part:

**Duties in the Event Of Occurrence, Offense, Claim or Suit.**

      a.   You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. . . .

      b.  If a claim is made or "suit" is brought against any insured, you must . . . see to it that we receive written notice of the claim or "suit" as soon as practicable.

Transcontinental Policies, CGL Coverage Form, § IV 2. "The failure of an insured to give timely

notice of loss in contravention of a policy provision is a legal basis for denial of coverage under

the policy." <u>Fla. Mun. Liab. Self Insurers Program v. Mead Reinsurance Corp.</u>, 796 F. Supp.

509, 513 (S.D.Fla. 1992). "If the insured breaches a notice provision, prejudice to the insurer

will be presumed, but may be rebutted by a showing that the insurer has not been prejudiced by

the lack of notice." <u>Bankers Ins. Co. v. Macias</u>, 475 So.2d 1216, 1218 (Fla. 1985).

Here, the Transcontinental Policies only require written notification when a suit is

brought against the insured. Although the Transcontinental Policies require notice of an

"occurrence," there is no requirement that such notification must be written. Transcontinental

asserts that LWC became aware of waterproofing problems in March of 2000 and of the lawsuit

against it in February of 2002. Transcontinental further alleges that it first received notice of

these matters in May of 2006. LWC has provided an affidavit by Joseph Staniewicz, Jr.

8

("Staniewicz), who LWC asserts is an agent of Transcontinental for the purpose of receiving notice. In the affidavit, Staniewicz states that he received verbal notification from LWC of the lawsuit in March of 2002, and that he also received a copy of the complaint. Aff. of Joseph Staniewicz, Jr., at ¶ 6-7, sworn to March 20, 2008 (dkt # 91-3). The affidavit also states that he instructed an employee to notify Transcontinental of the lawsuit, and that to the best of his knowledge Transcontinental was notified. Id. at ¶ 8. In the affidavit, Staniewicz also states that Transcontinental had authorized him to accept notice on behalf of insureds and that he had accepted notice on other occasions. Id. at ¶ 9.

Given the contrary assertions, there is a material issue of fact as to when Transcontinental received notice of the waterproofing issues and the resulting lawsuit. Moreover, although LWC does not allege that it notified Transcontinental of the waterproofing problems prior to 2002, there is a material issue of fact concerning when LWC became aware that the defective waterproofing was causing damage to the Condominiums. Therefore, this Court is unable to determine if Transcontinental received late notice of the damage, and if so, whether Transcontinental was prejudiced as a result.

2. LWC's Coverage Under the Transcontinental Policies

a. Presence of an "Occurrence"

Transcontinental asserts that even if notice was timely, the Transcontinental Policies provide no coverage for LWC's claims. Assuming LWC prevailed on the issue of notice, Transcontinental could still prevail on a motion for summary judgment if, as a matter of law, the Transcontinental Policies provide no coverage for LWC's claims. The Transcontinental Policies state that coverage is provided for "property damage" only if it "is caused by an 'occurrence' that

9

takes place in the 'coverage territory' . . . and occurs during the 'policy period.'"[1]
Transcontinental Policies, CGL Coverage Form, § I Coverage A 1(b)(1). An "occurrence" is
defined as "an accident, including continuous or repeated exposure to substantially the same
general harmful conditions." Id., § V 12. The term "accident" is not defined. "[W]here the term
'accident' in a liability policy is not defined, the term . . . encompasses not only 'accidental
events,' but also injuries or damage neither expected nor intended from the standpoint of the
insured." State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998). "In
many cases the question of whether the injury or damages were unintended or unexpected will be
a question of fact; in some cases, the question will be decided as a matter of law, such as in cases
where the insured's actions were so inherently dangerous or harmful that injury was sure to
follow." Id. Here, there is a question of material fact as to whether LWC's actions were
expected or intended. See Essex Builders Group, Inc., v. Amerisure Ins. Co., 429 F. Supp.2d
1274, 1287 (M.D.Fla. 2005) (holding that whether contractor's defective work was expected or
intentional, and thus not an "occurrence," was a question of material fact). Therefore,
Transcontinental cannot demonstrate that coverage is lacking due to the absence of an
"occurrence."

b. "Property Damage" Caused by an "Occurrence"

Assuming for summary judgment purposes that LWC's defective work constituted an
"occurrence," coverage is only provided if the "property damage" was caused by the
"occurrence," and not subject to any other coverage exclusions. The Transcontinental Policies
define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of
use of that property." Transcontinental Policies, CGL Coverage Form, § V 15(a). A claim for

---

[1] Transcontinental does not assert that the damages allegedly covered by the Transcontinental Policies took
place before or after the Transcontinental Policies were in effect.

the cost of removing or repairing defective work does not constitute a claim for "property damage." *See* U.S. Fire Ins. Co. v. J.S.U.B., Inc., No. SC05-1295L (BJP), 2007 WL 4440232, at *15-16. (Fla. 2007) (stating that "[i]f there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage'"); Auto-Owners Ins. Co. v. Pozzi Window Co., No. SC06-779 (BJP), 2007 WL 4440389, at *4-5 (Fla. 2007).  A claim for the costs of repairing damage to other elements of the subject property that was caused by the defective work is a claim for "property damage" under a CGL policy.  Id. (stating that defective workmanship that damages an otherwise non-defective completed project constitutes "property damage" within the meaning of a CGL policy); *see* LaMarche v. Shelby Mut. Ins. Co., 390 So.2d 325, 326-27 (Fla. 1980) (citing Weedo v. Stone-E-Brick, Inc., 405 A.2d 788, 791-92 (N.J. 1979)).

Thus, any claim for costs incurred by repairing the defective waterproofing is not covered by the Transcontinental Policies.  However, costs incurred by repairing damages to other parts of the buildings that were damaged as a result of the defective waterproofing constitute "property damage" and may be covered by the Transcontinental Policies.  The state court judgment rendered against LWC did not specify the amounts awarded for repairs due to defective work and repairs to other property damaged by the defective waterproofing.  However, given that damage to the buildings included water in the soffit beams, mildew, stucco damage, and peeling and bubbling paint, which constitute "property damage" in this case, it is probable that at least part of the state court judgment is attributable to repairing damage to other parts of the property caused by LWC's defective work.  The amount of the judgment attributable to damage to other parts of the Condominiums, aside from LWC's own work, is merely another matter to be resolved at trial.  Therefore, Transcontinental has failed to demonstrate that there is no issue of material fact that

there was no "property damage" that was caused by an "occurrence."

### c. Exclusions

Thus far, this Court has determined that whether the defective waterproofing is an "occurrence" is a material fact to be resolved at trial. If the defective work is an "occurrence" within the meaning of the policy, then damage to other elements of the buildings caused by the defective waterproofing constitutes "property damage" caused by an "occurrence." However, even assuming the defective waterproofing is an "occurrence" that caused "property damage," Transcontinental may still prevail on summary judgment if the Transcontinental Policies contain an exclusion that bars coverage of such "property damage." Therefore, the only remaining question is whether the Transcontinental Policies contain an exclusion that would bar coverage for damage to other parts of the buildings that was caused by the defective waterproofing.

The Transcontinental Policies contain two relevant exclusions. Exclusion (j)(6) states that coverage does not apply to "property damage" to "[t]hat particular part of real property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it . . . . [T]his exclusion does not apply to 'property damage' included in the 'products-completed operations hazard.'" Transcontinental Policies, CGL Coverage Form, § I Coverage A 2(j)(6). Exclusion (l) states that coverage does not apply to "'property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Id. at § I Coverage A 2(l). "Your work" is defined, in relevant part, as "work or operations performed by you or on your behalf." Id. at § V 19(a). "Products-completed operations hazard" is defined, in relevant part, as "[i]nclud[ing] all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of

'your product' or 'your work.'"[2]  These provisions are typical of post-1986 CGL policies. *See* 4

David L. Leitner et al., Law and Practice of Insurance Coverage Litigation § 45:24.

Here, exclusion (j)(6) does not bar coverage because the exclusion does not apply to

"property damage" included in the "products-completed operations hazard."  Therefore,

exclusion (j)(6) does not bar coverage for "property damage" that occurs away from premises

that LWC owns or rents and that arises out of LWC's product or work. *See* Transcontinental

Policies, CGL Coverage Form, § V 19(a).  However, exclusion (l) bars coverage for "property

damage" to LWC's work that arises out of the work and is included in the "products-completed

operations hazard."  Thus, "property damage" to LWC's work that arises out of LWC's work,

when such work is done away from LWC's premises, is not covered, unless the damage was

caused by the work of a subcontractor. *See* Transcontinental Policies, CGL Coverage Form, § V

Coverage A 2(l).

The presence of exclusion (l) in a post-1986 CGL policy led the Supreme Court of

Florida in <u>United States Fire Insurance Company v. J.S.U.B., Inc.</u> to find that a contractor was

covered by a CGL policy because the damage to the house was caused by the work of a

subcontractor.  2007 WL 4440232, at *16.  In <u>J.S.U.B.</u>, a house being built by a contractor was

damaged due to a subcontractor's use of poor soil and improper soil and compaction testing. <u>Id.</u>

at *1.  The contractor had a CGL policy with relevant provisions identical to the provisions in the

Transcontinental Policies.  The court held that the subcontractor's faulty workmanship

---

[2] The "products-completed operations hazard" is a combination of two types of coverage. "The completed operations hazard coverage covers claims occurring after construction operations are completed." 4 David L. Leitner et al., Law and Practice of Insurance Coverage Litigation § 45:23 "The products hazard coverage covers claims caused by 'products' after the physical possession of the products has been released to others." <u>Id.</u> Thus, "[t]he principal thrust of completed operations is the insured's provision of a service, while the principal thrust of the products hazard is the insured's manufacture or sale of a product." <u>Id.</u> The "products-completed operations hazard" in the Transcontinental Policies also defines when work has been completed for purposes of the provision's application, although no party disputes that LWC completed the work.

constituted an "occurrence" under the post-1986 CGL policy and that the "occurrence" caused

the "property damage" to the house. The court found that no policy exclusion barred coverage

because the damage was caused by a subcontractor's faulty workmanship. Therefore, pursuant to

exclusion (l), which was identical to exclusion (l) in the Transcontinental Policies, the contractor

was covered by the policy. Id. at *16.

While J.S.U.B. is factually similar to the case at bar, there are important distinctions. In

J.S.U.B., the exception to exclusion (l) relating to work performed by a subcontractor was

critical. In J.S.U.B., the contractor would not have been covered absent the subcontractor

exception to exclusion (l) because in that case, "your work" encompassed the construction of the

house, which was the project undertaken by the contractor. Therefore, no coverage would have

obtained without the subcontractor exception because it was the house that was damaged by the

improperly prepared soil. Here, LWC's work was limited to waterproofing, and cannot be

construed as encompassing the larger scope of overall construction of the Condominiums. The

significance of this distinction is that in LWC's case, the meaning of "your work" is limited to

the waterproofing. This limitation affects the application of exclusion (l) because only damage to

LWC's work that arises out of LWC's work is barred by the exclusion. Therefore, coverage of

damage to other parts of the subject property aside from the waterproofing work performed by

LWC's is not barred by exclusion (l).

LWC is not barred from coverage as a matter of law because none of the exclusions in the

Transcontinental Policies bar coverage. As long as the potential for coverage exists,

Transcontinental cannot prevail on its motion for summary judgment. Given that damage to the

Condominiums caused by LWC's defective waterproofing, aside from the faulty workmanship

itself, may constitute an "occurrence," that the "property damage" was caused by the

"occurrence" if there was an "occurrence," and that there are no exclusions barring coverage as a matter of law, the potential for coverage exists. Therefore, Transcontinental's motion for summary judgment concerning coverage for damages to other parts of the property aside from LWC's own work must be denied.

### d. Lucas' Coverage Under the Transcontinental Policies

Transcontinental asserts that Lucas is not covered by the Transcontinental Policies because he is not an insured. The Transcontinental Policies provide that "'executive officers' and directors are insureds, but only with respect to their duties as your officers or directors." Transcontinental Policies, CGL Coverage Form, § II 1(d). The underlying judgment against Lucas was rendered against him because he signed a Guaranty of Performance of Subcontract, thereby providing a personal guaranty for the work. In doing so, Lucas was acting in his individual capacity and not as an officer or director of LWC. *See* Egyptian Nav. Co. v. Uiterwyk, No. 83-334 CIV-T-10 (WTH), 1988 WL 70047, at *2 (M.D.Fla. 1988) (finding that corporate officer who signed a personal guaranty acted in his personal capacity and was personally liable); Roy v. Davidson, Inc., 423 So.2d 496, (Fla. 4th DCA 1982) (finding that corporate officer who signed personal guaranty with notation of "president" next to the signature, acted in his personal capacity and was personally liable). Therefore, Lucas was acting in his personal capacity when he signed the personal guaranty and is not an insured for purposes of the judgment rendered against him in the underlying action.

### 3. Attorneys' Fees and Costs

In Count II of Defendants' Answer to the Third Amended Complaint and Counterclaims (dkt # 50), LWC and Lucas seek payment from Transcontinental in the amount of the state court judgment rendered against LWC and Lucas, up to the available policy limit. Of the total

$1,105,852 judgment against LWC, $448,793 was for attorneys' fees of the prevailing party and $77,197 was for costs incurred by the prevailing party. Transcontinental asserts that attorneys' fees and costs awarded to Orchid are not covered by the Transcontinental Policies because they are not damages to which the Transcontinental Policies apply.

To determine if Transcontinental may prevail on the matter of attorneys' fees and costs, this Court will assume for summary judgment purposes only that LWC is covered under the Transcontinental Policies for the portion of the underlying judgment attributable to damage to other parts of the buildings excluding damage to LWC's own work. Proceeding on that assumption, the Transcontinental Policies must be construed according to their plain meaning to ascertain whether coverage is provided for attorneys' fees and costs arising from an adverse judgment against LWC which is partially covered. Any ambiguity in the language "must be resolved liberally in favor of the insured and strictly against the insurer." Prudential Property & Cas. Ins. Co. v. Swindal, 622 So.2d 467, 472 (Fla. 1993). The Transcontinental Policies provide coverage for "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." Transcontinental Policies, CGL Coverage Form, § 1 Coverage A 1(a). "Property damage" is defined, in relevant part, as "[p]hysical injury to tangible property, including all resulting loss of use of that property." Id. at § V 15(a). The term "damages" is not defined.

The question of whether attorneys' fees and costs are covered under the Transcontinental Policies turns on whether the attorneys' fees and costs are damages arising because of "property damage" to which the Transcontinental Policies apply. In Scottsdale Insurance Company v. Haynes, the Florida 5th DCA found that attorneys' fees were not damages within the meaning of an assisted living facility's liability policy. 793 So.2d 1006 (Fla. 5th DCA 2001). In that case,

the policy stated that coverage included "all sums which the insured shall become legally obligated to pay as damages because of injury to which this insurance applies caused by a medical incident which occurs during the policy period" Id. at 1008 (emphasis omitted).  The court found that an award of attorneys' fees to a prevailing party arising from a statutory or contractual provision was not "damages because of injury to which this insurance applies." Id. at 1009-10.

In reaching that holding, the court relied on the premise that "[i]t is generally held that attorney's fees are not damages, but are ancillary to damages, and are not part of the substantive claim." Id. at 1009 (citing Cheek v. McGowan Elec. Supply, 511 So.2d 977, 979 (Fla. 1987). The Haynes court adopted this premise from the reasoning in Cheek v. McGowan Electric Supply, in which the Florida Supreme Court stated that "[a] contractual provision authorizing the payment of attorney's fees is not part of the substantive claim because it is only intended to make the successful party whole by reimbursing him for the expense of litigation . . . and can only be recovered after the determination of the prevailing party has been made." 511 So.2d 977, 979 (Fla. 1987).  In adopting this premise, the Haynes court was reasoning by analogy because Cheek did not involve insurance coverage but rather addressed the issue of whether proof of entitlement to attorneys' fees sought pursuant to a contractual provision may be put forth for the first time after trial.  The court held that proof of entitlement to attorneys' fees pursuant to a statutory or contractual provision may be put forth for the first time after trial because entitlement to such attorneys' fees is not a substantive component of a breach of contract claim.

The analogy draw in Haynes is apposite to the extent that the rationale underlying the distinction between attorneys' fees available to a prevailing party through a contractual provision and damages attributable to a substantive breach of contract is germane to ascertaining whether

an award of attorneys' fees against an insured constitutes damages arising because of "property damage" covered by a liability policy. In other words, the reasoning in <u>Cheek</u> is pertinent to the matter of attorneys' fees here only if the reason why attorneys' fees are not damages in a breach of contract action may also serve as the reason why attorneys' fees should not constitute damages within the meaning of a liability policy. The thrust of the reasoning in <u>Cheek</u> is that a contractual provision entitling a prevailing party to attorneys' fees is not integral to the core purpose of the bargain, as evidenced by the fact that an award of attorneys' fees cannot be had absent a judgment on a substantive term of the contract. A contractual term for attorneys' fees cannot form the substantive basis for a breach of contract action and is merely remedial in the sense that its only purpose is to make the prevailing party whole once the breach of a substantive provision occurs.

In the case of insurance, however, the core purpose of an insurance policy is always to protect the insured from losses covered by the policy. Liability policies generally grant an insurer the right and duty to defend the insured against claims seeking damages that may be covered by the policy.[3] *See* <u>Employers Ins. Co. of Wausau v. Nat'l Union Fire Co.</u>, 07-cv-1099-T-30EAJ (JSM), 2008 WL 1777807, at * 3 (M.D.Fla. 2008) (stating the an insurer must defend against even the most frivolous suit as long as the claim is for a covered "occurrence"). The insurer's right to defend "is a valuable one in that it reserves to the insurer the right to protect itself against unwarranted liability claims and is essential in protecting its financial interest in the outcome of litigation." <u>Travelers Indem. Co. of Ill. v. Royal Oak Enters.</u>, 344 F. Supp.2d 1358, 1374

---

[3] "A significant element of coverage in a liability policy is not only the duty to pay covered loss damages, but also the costs of defense of the claim. When a claim is made under a general liability policy the insurer has a duty to investigate the claim and a duty to either provide a defense, provide a defense under a reservation of rights where there is an arguable issue of coverage, or decline the coverage of the claim and the defense based on a decision of the insurer that there is no coverage." 8 Larry R. Leiby, Florida Practice, Construction Law Manual § 20.09A (2007).

(M.D.Fla. 2004). The insurer's duty to defend protects the insured from costs associated with the insured's defense against claims for damages by third-parties. Therefore, by its terms, a liability policy giving rise to a duty to defend protects the insured not only against claims for damages, but against the expense of defending against claims for damages. *See* 8 Larry R. Leiby, Florida Practice, Construction Law Manual § 20.09A (2007).

The right of an insurer to defend against claims for damages covered by a policy grants the insurer full discretion to settle the claim immediately or to mount a vigorous defense culminating in a trial and subsequent appeal. However, when a claim for damages against an insured arises out of a contract containing a provision entitling the prevailing party to attorneys' fees, the amount of attorneys' fees and costs generated by the claimant will be proportionately related to the extent to which the insurer chooses to defend against the claim. Thus, in a case where it is in the insurer's best interest to assert a lengthy and costly defense, the result will be to increase the attorneys' fees and costs generated by the opposing party and the corresponding liability to the insured if that party prevails.

If an insurer may defend against a claim that is covered by the policy without taking into account potential attorneys' fees and costs that will be awarded if the opposing party prevails, the insurer creates an externality whereby, in the course of seeking to minimize its own liability, it imposes potential costs on the insured at no additional cost to itself. This externality undermines the very reason why an insurer can at once possess a duty and a right to defend, which is that the interests of the insured and the insurer are presumed to be aligned with respect to a claim for damages covered by the policy. Every dollar of liability for a covered claim for which the insured cannot be held liable is a dollar saved by the insurance company. If, however, when defending against a claim that is covered by the policy, an insurer can increase the liability of the

insured while simultaneously decreasing its own liability, the interests of the insurer and insured are no longer aligned, giving rise to a conflict between the insurer and insured and making the coexistence of the right and duty to defend untenable. *See* Liberty Mut.Fire. Ins. Co. v. Kaufman, 885 So.2d 905, 908 (Fla. 3d DCA 2004) (stating that there is a fiduciary relationship between insurer and insured and when insurer accepts the defense of claims against the insured their interests essentially merge).

For this reason, the premise relied on by the Haynes court in finding that an award of attorneys' fees is not damages arising because of an injury covered by the policy -- i.e., that a contractual term providing for attorneys' fees does not constitute damages in a breach of contract action, -- is not pertinent to resolving the question of whether attorneys' fees and costs are damages arising because of "property damage" to which an insurance policy applies. Reasoning by analogy is not helpful here because there is too great a difference between a contractual provision for attorneys' fees which are ancillary to the contract and purely remedial and an insurance policy in which insuring against the costs of defending against a claim for covered damages is a core purpose of an insurance policy and a primary reason why an insured purchases a policy.

The fundamental differences between the non-substantive nature of a contractual provision granting attorneys' fees and costs to the prevailing party and the substantive nature of an insurer's right and duty to defend, the externality that would arise by permitting an insurer to defend against a claim covered by the policy without accounting for the attorneys' fees imposed on the insured if the claimant prevails, and the need to maintain an alignment of interests between the insurer and insured with respect to claims for damages covered by the policy, all

militate against adopting the reasoning in <u>Haynes</u>.[4]  Therefore, this Court finds that attorneys' fees and costs that an insured becomes obligated to pay because of a contractual or statutory provision, which are attributable to an insurer's duty to defend the insured against claims that would be covered by the policy if the claimant prevails, constitute damages because of "property damage" within the meaning of a CGL policy.

It bears mentioning again at this point that this analysis proceeds on the assumption, for summary purposes only, that a portion of the state court judgment against LWC is covered by the Transcontinental Policies.  This Court need make no additional findings concerning Transcontinental's potential liability for attorneys' fees and costs.  The fact that Transcontinental may be liable for attorneys' fees and costs awarded to Orchid in the underlying action, contingent upon a number of other findings in LWC's favor, is sufficient to deny Transcontinental's motion for summary judgment on the issue of attorneys' fees.

C.    LWC and Lucas' Motion for Summary Judgment

LWC and Lucas seek to prevail on summary judgment on the issue that their notice to Transcontinental was sufficient to protect their rights under the Transcontinental Policies.  As discussed above, there is a material issue of fact concerning whether LWC and Lucas' provided timely notice to Transcontinental.  Therefore, LWC and Lucas may not prevail on this issue.

IV.    **CONCLUSION**

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Plaintiff Assurance Company of America's Motion

---

[4]  "In determining the content of applicable state law, federal courts must look to the State's legislature or highest court for an articulation of that law."  <u>Barnett Bank of South Fla. v. F.D.I.C.</u>, 883 F. Supp. 707, 709 (S.D.Fla. 1995) (citing <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 76-81 (1938)).  "When there is no controlling state statute or pronouncement by that State's highest court, a federal court is directed to 'determine issues of state law is it believes the highest court of the state could determine them, not necessarily . . . as they have been decided by other state courts in the past.'"  <u>Id.</u> (citing 19 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure, § 4507 (1982)).

for Partial Summary Judgment (dkt # 88) is DENIED. It is further,

ORDERED AND ADJUDGED that Defendant/Cross-Defendant Transcontinental

Insurance Company's Motion for Summary Judgment (dkt # 92) is GRANTED IN PART AND

DENIED IN PART. The motion is GRANTED on the issue that Lucas is not an insured under

the Transcontinental Policies. The motion is DENIED as to all other matters. It is further

ORDERED AND ADJUDGED that Defendants Lucas Waterproofing Company, Inc. and

Robert K. Lucas' Motion for Partial Summary Judgment as to Transcontinental Insurance

Company's Sixteenth Affirmative Defense to Count II of the Cross-Claim (dkt # 90) is DENIED.

All pending motions in Case No. 07-14167-CIV-MOORE are DENIED AS MOOT. The parties

are reminded to file all documents in Case No. 07-14084-CIV-MOORE.

DONE AND ORDERED in Chambers at Miami, Florida, this _3*_ day of May, 2008.


K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:     All counsel of record

22